## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

AMY JOYCE CHRISTOPHER,

               Plaintiff,

      v.

ANDREW M. SAUL, Commissioner of
Social Security,

               Defendant.

CIVIL ACTION NO. 3:19-CV-01325

(MEHALCHICK, M.J.)

## MEMORANDUM OPINION

Plaintiff Amy Joyce Christopher brings this action under section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits under Title II of the Social Security Act. (Doc. 1). The matter was referred to the undersigned United States Magistrate Judge to prepare a report and recommendation pursuant to 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b). The parties thereafter consented to the undersigned's jurisdiction, pursuant to 28 U.S.C. § 636(c)(1), to adjudicate all proceedings related to this action. (Doc. 8).

For the following reasons, the Court will AFFIRM the Commissioner's decision to deny Christopher benefits, direct final judgment in favor of the Commissioner, and direct the Clerk of Court to close this case.

## I. BACKGROUND AND PROCEDURAL HISTORY

In March 2014, Christopher protectively filed an application for Title II disability insurance benefits, claiming disability beginning August 25, 2013, due to reflex sympathetic dystrophy (RSD), complex regional pain syndrome (CRPS), and depression. (Doc. 6-6, at 2;

Doc. 6-7, at 6-7). The Social Security Administration initially denied the application on May 6, 2014, prompting Christopher's request for a hearing, which Administrative Law Judge (ALJ) Michelle Wolfe held on January 5, 2016. (Doc. 6-5, at 2, 19; Doc. 6-3, at 2). In a written decision dated March 30, 2016, the ALJ determined that Christopher is not disabled and therefore not entitled to benefits under Title II. (Doc. 6-4, at 34).

Christopher requested appellate review, and the Appeals Council (AC) vacated the hearing decision and remanded Christopher's claim under the "additional evidence provision" in 20 C.F.R. § 404.970(5). (Doc. 6-4, at 39). The AC considered new evidence that Christopher submitted after her hearing, namely, a treatment record and narrative from Christopher's treating neurologist, Kenneth W. Lilik, M.D., indicating that Christopher (1) has less use of her left index and middle fingers; (2) has weakened grip strength of her right hand; (3) cannot raise her right arm above her shoulder; (4) exhibited a "migration" of symptoms consistent with the diagnosis of RSD. (Doc. 6-4, at 39-40). The AC directed the ALJ to reevaluate Christopher's impairments in light of this evidence, further evaluate Christopher's RSD pursuant to Social Security Ruling (SSR) 03-02p,[1] give further consideration to Christopher's maximum residual functional capacity and fully explain the weights the ALJ accords to treating, nontreating, and nonexamining source opinions, and, if warranted, obtain supplemental evidence from a vocation expert "to clarify the effect of the assessed limitations on [Christopher's] occupational base . . . ." (Doc. 6-4, at 40).

---

[1] Titles II & Xvi: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/complex Reg'l Pain Syndrome, SSR 03-2P (S.S.A. Oct. 20, 2003), 2003 WL 22399117, available at https://www.ssa.gov/OP_Home/rulings/di/01/SSR2003-02-di-01.html.

On remand, the ALJ held a second hearing, on April 3, 2018, and again determined, in a June 12, 2018 written decision, that Christopher is not disabled and therefore not entitled to benefits under Title II of the Act. (Doc. 6-2, at 33). Christopher requested review of the ALJ's decision, which request the AC denied on May 31, 2019. (Doc. 6-2, at 2-6).

On July 31, 2019, Christopher commenced the instant action. (Doc. 1). The Commissioner responded on October 2, 2019, providing the requisite transcripts from Christopher's disability proceedings. (Doc. 5; Doc. 6). The parties then filed their respective briefs (Doc. 9; Doc. 10), with Christopher alleging one principal ground for reversal or remand (Doc. 9, at 6).

## II.   STANDARDS OF REVIEW

To receive benefits under Title II of the Social Security Act, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1509. To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in significant numbers in the national economy. 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1505(a).[2] Additionally, to be eligible to receive Title II benefits, a claimant must be insured for disability insurance benefits. 42 U.S.C. § 423(a)(1)(a); 20 C.F.R. § 404.131. To establish an entitlement to

---

[2] A "physical or mental impairment" is defined as an impairment resulting from "anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

disability insurance benefits under Title II, the claimant must establish that he or she suffered from a disability on or before the date on which they are last insured.

### A. ADMINISTRATIVE REVIEW

In evaluating whether a claimant is disabled, the "Social Security Administration, working through ALJs, decides whether a claimant is disabled by following a now familiar five-step analysis." *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 200–01 (3d Cir. 2019). The "burden of proof is on the claimant at all steps except step five, where the burden is on the Commissioner of Social Security." *Hess*, 931 F.3d at 201; *see* 20 C.F.R. § 404.1512(a)(1). Thus, if the claimant establishes an inability to do past relevant work at step four, the burden shifts to the Commissioner at step five to show that jobs exist in significant numbers in the national economy that the claimant could perform consistent with his or her residual functional capacity, age, education, and past work experience. 20 C.F.R. § 404.1512(a)(1).

### B. JUDICIAL REVIEW

The Court's review of a determination denying an application for Title II benefits is limited "to considering whether the factual findings are supported by substantial evidence." *Katz v. Comm'r Soc. Sec.*, No. 19-1268, 2019 WL 6998150, at *1 (3d Cir. Dec. 20, 2019). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). The quantum of proof is less than a preponderance of the evidence but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial if the ALJ ignores countervailing evidence or fails to resolve a conflict created by such evidence. *Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993). In an adequately

developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966).

The question before the Court, therefore, is not whether Christopher is disabled, but whether the Commissioner's determination that Christopher is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. *See Arnold v. Colvin*, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote a lack of substantial evidence."); *Burton v. Schweiker*, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The [Commissioner]'s determination as to the status of a claim requires the correct application of the law to the facts."); *see also Wright v. Sullivan*, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." *Leslie v. Barnhart*, 304 F. Supp. 2d 623, 627 (M.D. Pa. 2003). If "the ALJ's findings of fact . . . are supported by substantial evidence in the record," the Court is bound by those findings. *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).

## III.    THE ALJ'S DECISION

In her written decision,[3] the ALJ determined that "[Christopher] has not been under a disability, as defined in the Social Security Act, from August 25, 2013, through the date of

---

[3] All references to the ALJ's "written decision" are to the ALJ's 2018 post-remand decision (*see* Doc. 6-3, at 16-34), which represents the Commissioner's final determination regarding Christopher's claim for benefits.

this decision." (Doc. 6-2, at 33). The ALJ reached this conclusion after proceeding through the five-step sequential analysis provided in 20 C.F.R. § 404.1520(a)(4). Initially, the ALJ determined that Christopher's "earnings record shows that [she] has acquired sufficient quarters of coverage to remain insured through December 31, 2018." (Doc. 6-2, at 17).

### A.   STEP ONE

At step one of the five-step analysis, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is engaging in substantial gainful activity, the claimant is not disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520(b). Substantial gainful activity is defined as work activity requiring significant physical or mental activity and resulting in pay or profit. 20 C.F.R. § 404.1572(a)-(b). The ALJ must consider only the earnings of the claimant. 20 C.F.R. § 404.1574(a)(2). Here, the ALJ determined that "[Christopher] has not engaged in substantial gainful activity since August 25, 2013, the alleged onset date." (Doc. 6-2, at 19).

### B.   STEP TWO

At step two, the ALJ must determine whether the claimant has a medically determinable impairment or combination of impairments that is severe and meets the 12-month duration requirement. 20 C.F.R. § 404.1520(a)(4)(ii). If the ALJ determines that a claimant does not have an "impairment or combination of impairments which significantly limits" the claimant's "physical or mental ability to do basic work activities," the ALJ will find that the claimant does not have a severe impairment and is therefore not disabled. 20 C.F.R. § 404.1520(c). If a claimant establishes a severe impairment or combination of impairments, the ALJ considers step three. Here, the ALJ found that Christopher has seven severe medically determinable impairments: posttraumatic ulnar neuropathy left arm, RSD,

left brachial plexopathy, left C6 radiculopathy, frozen left shoulder, obesity, and status post dual chamber pacer implant. (Doc. 6-2, at 19). The ALJ further determined that while Christopher suffers from other medically determinable impairments, none are severe.

C.   STEP THREE

At step three, the ALJ must determine whether the severe impairment or combination of impairments meets or equals the medical equivalent of an impairment listed in the version of 20 C.F.R. Part 404, Subpt. P, App. 1 that was in effect on the date of the ALJ's decision. 20 C.F.R. § 404.1520(a)(4)(iii). The sections in this appendix are commonly referred to as "listings." Here, the ALJ determined that neither of Christopher's impairments, considered individually or collectively, meets or medically equals the severity of a listed impairment. (Doc. 6-2, at 22). The ALJ specifically considered sections 11.14 (peripheral neuropathy), 1.02 (major dysfunction of a joint), and 1.04 (disorders of the spine), along with SSR 02-1p (obesity and its effect on other impairments) and SSR 03-2p (RSD/CRPS). (Doc. 6-2, at 22); *see* 20 C.F.R. Part 404, Subpt. P, App. 1 § 1.00.

D.   RESIDUAL FUNCTIONAL CAPACITY

Between steps three and four, the ALJ evaluates the claimant's residual functional capacity (RFC), crafted upon consideration of all the evidence presented. At this intermediate step, the ALJ considers all claimant's symptoms and "the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a). This involves a two-step inquiry according to which the ALJ must (1) determine whether an underlying medically determinable mental impairment or impairments could reasonably be expected to produce the claimant's symptoms; and, if so, (2) evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to

determine the extent to which they limit the claimant's functional limitations. *See* 20 C.F.R. § 404.1529(b)-(c).

Here, Christopher alleged that her impairments caused various symptoms that limit her ability to lift, walk, climb stairs, squat, sit, bend, kneel, memorize, use her hands, stand, complete tasks, reach, and concentrate. (Doc 6-7, at 28). She indicated that many activities are "very tiring and painful" and that it is difficult to think and stay on task." (Doc. 6-7, at 28). The ALJ summarized Christopher's testimony concerning her symptoms and resultant limitations as follows:

> [Christopher] has alleged disability based on [RSD], [CRPS], and depression. She reported that she is 5'6" tall and 225 pounds. At the remand hearing, [Christopher] testified that her parents have her 13-year old autistic daughter "pretty much all the time" and they take her other children fairly often as well, to help her and her husband care for them, insofar as her husband had medical problems, too. She said she does not drive at all anymore because she is physically unable to do "defensive driving" and her medications make her feel "out of it." She claimed she does not go to the grocery store anymore. She said her oldest daughter prepares a lot of the meals now because she ([Christopher]) has pain in her arms, which is worse with movement. She said she feels tired all the time. She said her husband helps her put on her shirt because she has a hard time getting it up over her head and arms. She said she has problems with her feet due to diabetes, she uses orthotics, and her A1c has been "pretty much out of control" since she was diagnosed. She said she receives infusions for anemia. She claimed she still has palpitations every day even though she is on medication for that. She said she does not see very well. She said she prefers not to lift even a cup (she uses a cup with a straw) because of her arm weakness.

> (Doc. 6-2, at 23-24 (internal citations to the record omitted)).

After weighing Christopher's statements against other evidence in the record, the ALJ found that while Christopher's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Christopher's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Doc. 6-2, at 24). The ALJ then went on to detail

Christopher's medical history and records and treatment history, among other evidence. (Doc. 6-2, at 24-31).

Christopher's medical issues and eventual diagnosis of RSD stem from injuries she sustained to her left arm during a November 2012 work-related incident, when she was 40 years old. (Doc. 6-8, at 3). Following that incident, in February 2013 (before the alleged onset date), Christopher began treating with her neurologist, Dr. Kenneth Lilik, concerning numbness and weakness of her left little and ring fingers. (Doc. 6-8, at 3). Christopher exhibited pain in the left posterior shoulder extending to the posterior upper arm to her elbow, intermittent numbness in the dorsal and palmer surfaces of the left little and ring fingers, extending to the wrist, which turned to continuous numbness in her fingers, and grip strength weakness involving her left little and ring fingers. (Doc. 6-8, at 3). Her shoulder had improved, and she had no pain in her neck or left axilla. (Doc. 6-8, at 3). Lilik reported that Christopher's deep tendon reflexes were normal at the biceps and triceps bilaterally, and she had exquisite pain upon palpitation of the left ulnar nerve at the elbow compared to the left wrist ulnar. (Doc. 6-8, at 3). She had no pain upon compression of the left median nerve at the wrist or the brachial plexus in the left axilla, mild weakness in the left flexor digitorum profundus and abductor digiti minimi muscles, decreased sensation to pinprick on the dorsal and palmar surfaces of the left little and ring fingers, from fingertips to 7 cm proximal to the left wrist. (Doc. 6-8, at 3).[4]

---

[4] The same EMG report reflects Lilik's notes concerning nerve conduction reflecting normal results except that the left ulnar palmer sensory action potential was normal distal latency but reduced in amplitude at 7.3 microvolts and ulnar dorsal cutaneous sensory action potentials were normal distal latency bilaterally, amplitude was reduced left at 3.2 microvolts

While Christopher stopped working on August 25, 2013, her alleged disability onset, it was initially because of issues with her heart following her diagnosis with syncope. (Doc. 9, at 3; Doc. 6-3, at 8; Doc. 6-2, at 71). Christopher began to experience syncopal episodes that caused lightheadedness and weakness and caused her to faint multiple times. (Doc. 6-8, at 47). Ultimately, in late 2013, doctors placed a pacemaker inside Christopher to relieve the syncope, although the pacemaker was later replaced because it was not working properly. (Doc. 6-8, at 44; Doc. 6-8, at 34; Doc. 6-22, at 36).

From August 2013 through 2017, Lilik, along with Christopher's pain management and other treating physicians, consistently reported issues with Christopher's left side. These issues included: frozen left shoulder and stiffness in her left shoulder; burning and aching pain in her left anterior and posterior shoulder, extending to the posterior upper arm, dorsal forearm, and dorsal radial aspect of her hand and left middle finger, and in her left lateral upper and posterior arm, volar left forearm, and palmar region of her left hand; absent deep tendon reflexes in her biceps and triceps; left-hand claw deformity; tenderness over the left ulnar cubital tunnel; ulnar neuropathy with proximal axonal injury based on an EMG; burning pain, atrophy, bluish discoloration, and increased temperature suggesting RSD of the left upper extremity; posttraumatic left brachial plexopathy; neck pain associated with C6 radiculopathy; burning pain, numbness, and decreased sensation involving the left little, ring, and middle fingers extending to the elbow; pain in the left medial upper arm; static and chronically flexed fixed left little, ring, and middle fingers; an inability to lift her left arm to

---

and normal right. (Doc. 6-8, at 3). A motor unit examination revealed that the left flexor digitorum profundus and abductor digiti minimi muscles contained mild decreased recruitment. (Doc. 6-8, at 3).

shoulder height or raise the arm more than 30 degrees, sometimes 60 degrees, and later 80 degrees; an impeded range of motion and inability to extend her left little, ring, and middle fingers; weakness in her left index finger; coolness of her left posterior upper arm, on the dorsal volar surfaces of her left hand, and tenderness upon palpation of the hypothenar region of the left hand and the palmer surfaces of the left little, ring, and middle fingers; decreased sensation to sharp prick in dorsum of the metacarpals of the right little and ring fingers; hypersensitivity to touch in the volar left forearm, dorsum and palmer surfaces of her left hand, left elbow, left upper medial arm, axilla, and hand, left arm to shoulder level particularly below the elbow, and left wrist; constantly flexed left arm; burning pain in her left upper chest wall extending to her left neck and face; distal extensor weakness of her left index finger; decrease ability to tap her right foot; issues with and limping on her left leg. (Doc. 6-8, at 30-34, 38-39, 42-43, 44-45, 47-48, 50-51, 53-54; Doc. 6-22, at 20-37).

Along with the issues concerning her left side, Christopher also reported pain, limited functionality, and related issues in her right side. In November 2013, Christopher indicated she had recently begun to feel pain in her right anterior shoulder and posterior upper arm. (Doc. 6-8, at 44). Lilik's notes reflect that Christopher could not elevate her right arm anteriorly to the side more than proximally to 50 degrees, and she had tenderness upon palpitation of her right anterior shoulder. (Doc. 6-8, at 44). In November and December 2013, Christopher complained to her pain management specialist that she felt right-shoulder pain. (Doc. 6-8, at 30-34). Pain management recommended that Christopher consult with a pain clinic for "possible evaluation for a spinal cord stimulation" and further noted the "other possibility of bilateral pain she has is, thoracic outlet syndrome from a cervical rib disease." (Doc. 6-8, at 33-34, 42-43).

Christopher's right-side complaints persisted in 2014 and 2015. Examination notes from February 2014 reflect that Christopher had become hypersensitive to light touch on the dorsum of her right forearm, right dorsal thigh, and right hip – to which Lilik noted that the spinal cord simulator was the best option to slow the migration of the complex RSD. (Doc. 6-8, at 38-39). In May 2014, Lilik reported that Christopher had difficulty raising her right shoulder, her right hand had begun to stiffen, and she felt pain in the dorsum of her right forearm and upper arm. (Doc. 6-22, at 36). Lilik's diagnostic impression included migration of complex RSD, but he was unable to evaluate Christopher's "proximal strength in either upper extremity due to limited range of motion." (Doc. 6-22, at 36-37). In November 2014, Christopher reported that the pain in her right upper extremity had stabilized and lessened, but she could not raise her right arm to 180 degrees, over shoulder height but not fully. (Doc. 6-22, at 34). Christopher had decreased sensation to sharp prick in the right little and ring fingers and the hypothenar and ulnar region of the right hand, as well as to pinprick in the and right posterior upper arm. (Doc. 6-22, at 35). In May 2015, Christopher reported "some pain in her right shoulder." (Doc. 6-22, at 32). Lilik's diagnostic impression did not mention Christopher's right side but indicated complex RSD of the left arm and suspected migration to the left foot and ankle. (Doc. 6-22, at 33).

Beginning in January 2016 – which point in time marks the ALJ's revised RFC to reflect more limited right-side functionality – Lilik noted indicated that Christopher's condition had worsened over the prior few months: she had even less use of her left index and middle fingers, pain, numbness of the right little and ring fingers extending to the right forearm to the elbow, her right-hand grip strength had weakened, and she was now unable to raise her right arm above her shoulder. (Doc. 6-22, at 30). She also exhibited decreased

sensation to sharp prick in the right ulnar distribution on the dorsal and palmar surfaces of her right hand. (Doc. 6-22, at 30-31). By May 2016, Lilik noted that Christopher's pain in both arms "seemed to be magnified." Christopher felt that the pain had "definitely" spread to her right arm and shoulder and had difficulty raising her right arm to shoulder level. (Doc. 6-22, at 28). Christopher had decreased sensation to sharp prick in the dorsum of the metacarpals of the right little and ring fingers, was hypersensitive to the remainder of the dorsum of her right hand, had decreased sensation to sharp prick in the palmar surface of her right hand, had decreased sensation in the dorsum and volar of the right forearm, and was hypersensitive in the dorsal and volar aspects of the right upper arm. (Doc. 6-22, at 29). In August 2016, Christopher reported pain in her right shoulder extending to her elbow and to her right forearm, although she had normal movement of her right hand and no longer felt right hip pain, and could not raise her right arm to shoulder level. (Doc. 6-22, at 23). She had decreased sensation in the right little and ring fingers and in the dorsum of the skin overlying those fingers, dorsum right forearm, right upper arm, and right shoulder. (Doc. 6-22, at 23).

In January 2017, Lilik noted that Christopher felt pain in her right anterior shoulder and the lateral posterior upper arm, and she was hypersensitive to light touch in the left anterior right shoulder and posterior right arm. (Doc. 6-22, at 24-25). Lilik's diagnostic impression included complex RSD involving the left arm and migrating to the right. (Doc. 6-22, at 25). In November 2017, Lilik observed a progression during the preceding three months, characterized as follows: Christopher's pain and weakness that involved the left arm now involved the right arm extending from the shoulders to the right elbow, she had pain extending from the dorsum of the right wrist into the dorsum of the thumb, index, and middle fingers, she could not raise her right arm more than 30 degrees, she had decreased sensation distal to

her forearms bilaterally involving the dorsum on the right and the anterior and posterior surfaces of both lower extremities from the mid lower extremities distally, she had posterior neck pain, and her right hand became cold intermittently and was often pale. (Doc. 6-22, 22).[5]

On February 2018, Christopher's last reported visit to Lilik that is part of the instant record, Lilik reported that Christopher had exquisite pain involving the right proximal upper arm, she had numbness in her right hand, she showed slow movements with her right hand, she had numbness and pain in her right foot, she could not drive, and she could not perform any household duties. (Doc. 6-22, at 20). On exam, she had decreased sensation to sharp prick distal to her right wrist, and she was hypersensitive to sharp prick more proximally in her right arm and in the entire left arm. (Doc. 6-22, at 21).

Upon reviewing the above treatment history as well as other of Christopher's medical records, Dr. Ronald E. Kendrick – an impartial medical expert[6] who testified at Christopher's administrative hearing – opined that Christopher "has a serious pain syndrome which is referred to as complex regional pain syndrome which was formerly known as reflex symptomatic dystrophy involving her left upper extremity which seemed to baffle her physicians who were trying to help her." (Doc. 6-2, at 50). He noted that EMG studies showed Christopher had developed increasing pain in her left upper extremity, along with left-arm

---

[5] Lilik's notes from November 2017 reflect that Christopher limped on her left leg and was unsteady when she walked. She also reported that she needed help to dress, she could eat using her right arm, she could wipe herself at the toilet, she could not drive, her children had to help her at home, she could not perform any household chores, she had posterior neck pain, and her right hand became cold intermittently and was often pale. (Doc. 6-22, at 22).

[6] Dr. Kendrick's qualifications were made part of the record and indicate that he is an orthopedic surgeon who had practiced since 1969 and retired from clinical practice in 2006. (Doc. 6-22, at 17-18).

ulnar neuropathy associated with C6 radiculopathy, and mild cervical spondylosis associated with a right foraminal stenosis at the C6-C7 level. (Doc. 6-2, at 50). Kendrick also referred to Christopher's obesity, episodes of syncope resulting in the placement of a pacemaker, and diabetes. (Doc. 6-2, at 51). Kendrick placed Christopher "at the light level with restrictions in the use of her left upper extremity to only occasional in all modalities," including in fine and gross manipulation with the left upper extremity and reaching. (Doc. 6-2, at 52-53). He further opined that Christopher should not work around dangerous moving machinery, unprotected heights, or heavy vibrating equipment. (Doc. 6-2, at 53). Then, beginning in 2018, Kendrick opined that he would place additional limitations on Christopher's right side, with only 50 percent use of that side.

Most pertinent to Christopher's instant challenges, when asked about whether he would place restrictions on Christopher's use of her right side, Kendrick opined, in relevant part, that "the right upper extremity is fairly recent," beginning in 2018, based on Kendrick's review of Dr. Lilik's notes of a migration of the RSD to Christopher's right side. (Doc. 6-2, at 53). Kendrick testified, "I don't think the outcome of that is known . . . ." (Doc. 6-2, at 53). Noting that Christopher report[ed] some pain" on her right side going back to 2016, Kendrick testified that doctors were not able to "make much of it." (Doc. 6-2, at 54). Kendrick stated, "[w]ell, she's had intermittent pain on the right side [as early as 2013], but I mean her -- the entire focus of her treatment was on her left side." (Doc. 6-2, at 54). Kendrick did not "see any period of 12 months of pain." (Doc. 6-2, at 55).

Kendrick acknowledged that Christopher "had issues with the right in January of 2016 per [Lilik's] record," specifically, upper right extremity pain, inability to raise her right arm over her head, and decreased abduction of the shoulders, although she had normal strength.

(Doc. 6-2, at 56). Kendrick also acknowledged Christopher exhibited absent hypersensitivity with respect to her right ulnar, as indicated in Dr. Lilik's mid-2016 exam notes. (Doc. 6-2, at 57). The doctor opined, however, that the objective medical studies did not support some of Christopher's objective complaints, stating: "In other words, there's a lot of inconsistency between the physical findings over the objective studies and what she complains about in the record. I can tell you that." (Doc. 6-2, at 57). Kendrick testified Lilik's notes reflected Christopher was experiencing right-side pain with inhibited strength, but she had no EMG changes on the right side from previous studies that "would indicate she has anything wrong with her musculoskeletal or neurological system on her right side." (Doc. 6-2, at 59-60).

Throughout his testimony, Kendrick made reference to the fact that RSD is difficult to diagnosis and that any symptom can be consistent with the condition. He stated that "the syndromes are primar[i]ly predicated on what patients tell doctors and doctors have no way of verifying pain" (Doc. 6-2, at 55). He further opined, "[t]here's no way of verifying whatsoever. And so people get all kinds of strange pains with these pain syndromes and anything goes so to speak." (Doc. 6-2, at 55).

Considering the above and all other record evidence,[7] the ALJ determined that from August 25, 2013, to December 31, 2015, Christopher had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) except she (1) could "lift and carry 20 pounds occasionally and 10 pounds frequently with the dominant right upper extremity, whereas the nondominant left upper extremity could be used more as only a guide"; (2) could *not* "push, pull, or perform

---

[7] As indicated, *supra*, the Court's recitation of the background is limited to those facts that are relevant to the issues raised in Christopher's brief.

overhead reaching with the nondominant left upper extremity" (3) could *not* "perform fingering or feeling for fine manipulation with the nondominant left upper extremity"; (4) could *not* "perform grasping or handling for gross manipulation with the nondominant left upper extremity"; (5) could "occasionally balance, stoop, crouch, crawl, kneel, and climb, but never on ladders, ropes, or scaffolds"; (6) "had to avoid concentrated exposure to temperature extremes of cold and heat, wetness, humidity, fumes, odors, dusts, gases, and poor ventilation"; and (7) had to "avoid moderate exposure to vibrations and hazards, including moving machinery and unprotected heights." (Doc. 6-2, at 23).

The ALJ further determined that Christopher became more limited after 2015 and crafted a second RFC to account for the further limitation:

> As of January 1, 2016, [Christopher] was reduced to sedentary exertion for lifting and carrying, and she had additional limitations for the dominant right upper extremity such that there would be a 50% reduction in the use of that extremity, which would fall within the realm of less than frequent but more than occasional use for pushing and pulling, reaching including overhead, lateral, and forward, and for fine and gross manipulation including fingering, feeling, grasping and handling with the dominant right upper extremity.

(Doc. 6-2, at 23).

E.   STEP FOUR

Step four requires the ALJ to determine whether the claimant has the RFC to perform the requirements of their past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A finding that the claimant can still perform past relevant work requires a determination that the claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(iv). Past relevant work is defined as work that the claimant has done within the past 15 years, that was substantial gainful activity, and that lasted long enough for the claimant to learn how to do it. 20 C.F.R. § 404.1560(b). "If the claimant can perform his past relevant work despite his limitations, [s]he is not disabled."

*Hess*, 931 F.3d at 202 (citing 20 C.F.R. § 404.1520(a)(4)(iv)). Here, based on testimony adduced from a vocational expert at Christopher's administrative hearing, the ALJ determined that Christopher was unable to perform her "past relevant work as a Registered Nurse (RN) and an RN Clinical Leader/Nurse Supervisor" and thus proceeded to step-five of the sequential analysis. (Doc. 6-2, at 31).

      F.   <u>STEP FIVE</u>

      At step five of the sequential analysis, the ALJ considers the claimant's age, education, and work experience to determine whether the claimant can make the adjustment to other work. 20 C.F.R. § 404.1520(a)(4)(v). If a claimant can adjust to other work, they will not be considered disabled. 20 C.F.R. § 404.1520(a)(4)(v). Here, considering Clay's age (41 years old on the date last insured, defined as "a younger individual age 18-49" during the relevant period), education, work experience, and RFC, the ALJ determined that there were jobs that existed in significant numbers in the national economy that Christopher can perform. In making this determination, the ALJ relied on the expertise of the vocational expert, who testified that Christopher could can perform the requirements of representative occupations such as furniture retail clerk (DOT No. 295.357-018, light, unskilled, with 16,000 positions statewide and 420,000 positions nationally), surveillance system monitor (DOT No. 379.367-010, sedentary, unskilled, with 3,800 positions statewide and 74,000 positions nationally), and charge account clerk (DOT No. 205.367-014, sedentary, unskilled, with 7,000 positions statewide and 200,000 positions nationally). (Doc. 6-2, at 32-33).

      Based on her determinations, the ALJ concluded that Christopher is not disabled and therefore denied her application for benefits. (Doc. 6-2, at 33).

## IV.   DISCUSSION

Christopher challenges the ALJ's determination based on the contention that the RFC "is not supported by substantial evidence of record in that it is based on medical opinion testimony inconsistent with SSR 03-2p which sets forth how the Commissioner is to evaluate [CRPS/RSD]." (Doc. 9, at 6). Christopher has no "complaint with the Commissioner's findings regarding the first four steps of the sequential evaluation." (Doc. 9, at 13).[8]

The assessment of an individual's RFC falls within the purview of the ALJ. 20 C.F.R. § 404.1546(c); SSR 96-8P, 1996 WL 374184 (S.S.A. July 2, 1996). "[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 121 (3d Cir. 2000) (quoting *Hartranft v. Apfel*, 181 F.3d 358, 359 n. 1 (3d Cir. 1999)). Specifically, one's RFC reflects the *most* that an individual can still do, despite his or her limitations, and is used at steps four and five to evaluative the claimant's case. 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8P, 1996 WL 374184 at *2. "[O]nce the ALJ has made this [RFC] determination, [a court's] review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be

---

[8] "It is well settled that an appellant's failure to identify or argue an issue in his opening brief constitutes waiver of that issue on appeal. This settled legal tenet applies to Social Security appeals where it is frequently held that: Arguments not raised in an appellant's opening brief are deemed waived." *Brown v. Colvin*, No. 3:16-CV-1123, 2017 WL 6606903, at *6 (M.D. Pa. Dec. 27, 2017) (internal citations and quotation marks omitted) (citing and quoting *Harvey v. Plains Twp. Police Dep't*, 421 F.3d 185, 192 (3d Cir. 2005) (quoting *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005)); *Wilson v. Colvin*, 218 F. Supp. 3d 439, 452 (E.D. Pa. 2016); *Cassell v. The Soc. Sec. ADM.*, 677 Fed. App'x 98, 99 (3d Cir. 2017); *Harris v. Comm'r Soc. Sec.*, 573 Fed. App'x 148, 150 n.1 (3d Cir. 2014)). All arguments not raised in Christopher's opening brief, including those based on the other steps of the sequential analysis, are therefore waived. The Court's analysis and related background concerning Christopher's impairments is therefore limited to the issues she raised in her brief.

set aside if it is supported by substantial evidence." *Black v. Berryhill*, No. 16-1768, 2018 WL 4189661 at *3 (M.D. Pa. Apr. 13, 2018).

When determining an individual's RFC, the ALJ must consider all the evidence of the record and, regardless of its source, "evaluate every medical opinion . . . receive[d]." *Burnett*, 220 F.3d at 121 (internal citations omitted); *see* 20 C.F.R. § 416.927(c); *see also* SSR 96-8P, 1996 WL 374182, at *2 ("RFC is assessed by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any 'medical source statements' . . . ."). Under the regulations, medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). If a conflict exists in the evidence, "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or the wrong reason.'" *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Mason*, 994 F.2d at 1066); *see also Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). It is the duty of the ALJ to explain the rationale for the weight afforded to each medical opinion, as this allows for meaningful judicial review. *Plummer*, 186 F.3d at 429 ("The ALJ must consider all the evidence and give some reason for discounting the evidence that [the ALJ] rejects." (quoting *Mason*, 994 F.2d at 1066)).

At issue here is SSR 03-2p, which is a Policy Interpretation Ruling that "explain[s] the policies of the [SSA] for developing and evaluating title II and title XVI claims for disability on the basis of Reflex Sympathetic Dystrophy Syndrome (RSDS), also frequently known as Complex Regional Pain Syndrome, Type I (CRPS)." SSR 03-2p, 2003 WL 22399117, at *1.

The Ruling indicates that RSDS and CRPS are synonymous terms and "are used to describe a unique clinical syndrome that may develop following trauma," characterized "by complaints of intense pain and typically includes signs of autonomic dysfunction." SSR 03-2p, 2003 WL 22399117, at *1. "The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma." SSR 03-2p, 2003 WL 22399117, at *1. "Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone." SSR 03-2p, 2003 WL 22399117, at *1. "It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual. When left untreated, the signs and symptoms of the disorder may worsen over time." SSR 03-2p, 2003 WL 22399117, at *1.

SSR 03-2p also instructs that "[c]omplaints of pain can further intensify, and can be reported to spread to involve other extremities." SSR 03-2p, 2003 WL 22399117, at *2. Further, "[m]uscle atrophy and contractures can also develop. Persistent clinical progression resulting in muscle atrophy and contractures, or progression of complaints of pain to include other extremities or regions, in spite of appropriate diagnosis and treatment, hallmark a poor prognosis." SSR 03-2p, 2003 WL 22399117, at *2. This ruling further provides, as pertinent to the instant matter:

> It should be noted that conflicting evidence in the medical record is not unusual in cases of RSDS due to the transitory nature of its objective findings and the complicated diagnostic process involved. Clarification of any such conflicts in the medical evidence should be sought first from the individual's treating or other medical sources. Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to deference and may be entitled to controlling weight.
>
> If we find that a treating source's medical opinion on the issue of the nature

and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator will give it controlling weight.

SSR 03-2p, 2003 WL 22399117, at *5.

Here, Christopher submits that "Dr. Kendrick's testimony and correspondingly the Commissioner's decision fails to conform to the requirements of SSR 03-2p" for several reasons: (1) Kendrick dismissed her "right arm complaints and the findings in the medical records dating back to 2013 as transient findings and complaints"; (2) Kendrick dismissed Christopher's complaints of pain "that are out of proportion with the objective tests or findings" merely because the complaints "did not make sense to him"; (3) Kendrick characterized Christopher's "complaints as 'obfuscation', that she was 'trying to mislead' her providers"; (4) Kendrick dismissed other complaints of Christopher's worsening RSD, "quip[ping] that 'anything can be consistent with that'"; (5) Kendrick's testimony "reveals an inability or unwillingness to evaluate and render opinions on functional ability resulting from a chronic pain syndrome such as RSD"; (6) Kendrick admitted that he usually refers patients such as Christopher to pain management rather than treat them himself; and (7) throughout Kendrick's testimony he "relates [Christopher]'s limitations based on diagnosis other than RSD and testing that support those diagnoses other than the RSD" without relating specific limitations to the RSD.  (Doc. 9, at 11-12).

Christopher goes on to argue that because of the ALJ's reliance on Dr. Kendrick's opinions, which the ALJ afforded great weight, the RFC fails to reflect Christopher's RSD and the effects of the progressive nature of that condition. (Doc. 9, at 12). As an example, Kendrick rejected evidence supporting a progression of Christopher's RSD to her right upper

extremity since late 2013 based on "her non-RSD diagnosis and testing results and not the hypersensitivity or other limitations associated [with] RSD." (Doc. 9, at 12). Similarly, Kendrick did not place any limitation on Christopher's ability to walk "despite evidence of the RSD spreading to her lower extremities." (Doc. 9, at 12).

Having thoroughly considered all the evidence of record, the Court finds substantial evidence to support the ALJ's RFC assessment notwithstanding Christopher's alleged functional limitations. To be clear, this is a case where the Court is not persuaded that it would have denied Christopher's application for benefits, but the "Court may not undertake a *de novo* review of the Commissioner's decision or re-weigh the evidence of record." *See Hansford v. Astrue*, 805 F. Supp. 2d 140, 143 (W.D. Pa. 2011) (citing *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-1191 (3d Cir.1986)); *see also Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005) ("[T]he scope of our review is quite limited. Like the District Court, we must uphold a final agency determination unless we find that it is not supported by substantial evidence in the record.").

Turning to SR 03-2p, the ALJ explicitly stated that she considered this ruling:

> I have considered the claimant's RSD/CRPS, pursuant to SSR 03-02p, in finding that the claimant was limited to a range of light exertion, which was later reduced to sedentary, that she had significant left upper extremity limitations, which later included some right upper extremity limitations as well, and that she has had some additional postural and environmental limitations as well, as set forth in the residual functional capacity.

(Doc. 6-2, at 29).

Christopher nonetheless challenges the RFC assessment on the basis that the ALJ erred in giving great weight to Dr. Kendrick's testimony and medical opinion. While it is true that Kendrick testified that symptoms of RSD can be self-manifested without the presence of

any real underlying condition and that RSD as a diagnosis can be consistent with any symptoms, he did not stop there. Rather, along with opining that Christopher had indeed been experiencing pain for a long period,[9] he noted that throughout Christopher's examinations with Dr. Lilik, she exhibited – without exception – normal tone and strength in her upper and lower extremities, including in her sternocleidomastoid and trapezius muscles. (*See, e.g.*, Doc. 6-8, at 23, 25, 27, 29, 30-31, 33, 35, 39, 45). Kendrick testified that if Christopher was not using both arms at home, the arms would show atrophy and there would be osteoporosis and osteopenia noted from lack of use. (Doc. 6-2, at 64).

Relying on Kendrick's opinion, the ALJ noted, "at no time did any of the records start to show atrophy of [Christopher's] limbs, which would be, per the medical expert, Dr. Kendrick, indicative of her not using her extremities to such an extent, and she continued to have normal tone and strength noted on her exams." (Doc. 6-2, at 24).[10] Thus, while Christopher alleged she did virtually nothing at home, the ALJ noted the lack of signs of atrophy the findings of normal strength and tone upon examination.  (Doc. 6-2, at 24).[11]  SSR

---

[9] Christopher argues that Kendrick characterized Christopher's complaints as fabricated or exaggerated (i.e., obfuscation), but Kendrick expressly stated that he believed Christopher had been suffering pain due to RSD and her other impairments. It is not entirely clear that Kendrick was writing off Christopher's complaints. Considering his testimony as a whole, it appears that Kendrick was expressing his opinion that certain tests do not yield reliable objective results, not that Christopher intentionally misled doctors. In any event, nowhere in the ALJ's decision does she indicate that she relied on this particular aspect of Kendrick's testimony in crafting the RFC.

[10] In one exam note from August 2013, before the alleged disability date, a pain management specialist indicated that Christopher was "showing atrophy of the hand and forearm muscle." (Doc. 6-8, at 53). The record does not otherwise show any signs of atrophy, nor does Christopher point to any evidence thereof.

[11] The ALJ also referred to evidence indicating that Christopher did, at some point,

03-2p itself instructs that muscle atrophy and contractures may develop in RSD cases, and while the ruling also indicates that progression of complaints of pain to other regions is indicative of RSD, the ALJ was entitled to credit Kendrick's testimony in crafting the RFC. The Court is generally not empowered to second guess the ALJ or her reliance on medical professionals. *See, e.g., Lopacinski v. Barnhart,* No. 01-CV-4364, 2003 WL 1962302, at *9 n.20 (E.D. Pa. Apr. 21, 2003) ("Our court of appeals has explained that an ALJ may consider his own observations of the claimant and this Court cannot second-guess the ALJ's credibility judgments. The only instance in which a reviewing court may second-guess and override such an evaluation is when it contradicts the medical opinion of a treating physician that is supported by the record." (internal quotation marks and citation omitted) (quoting *Morales v. Apfel,* 225 F.3d 310, 318 (3d Cir. 2000)).[12] Rather, the Court's obligation is to determine whether there is more than a scintilla of evidence supporting the RFC, and here there is.

Christopher submits that Kendrick[13] ignored the transient nature of RSD in forming

---

engage in activities of dialing living and caring for her children. (Doc. 6-2, at 24 (citing Doc. 6-8, at 44 ("She is raising 7 children at home, ages 3-14)). While the ALJ's single reference to the record alone does not amount to significant evidence that Christopher continued to engage in daily activities and care for her children, the ALJ nonetheless pointed to the Christopher's lack of atrophy and normal muscle tone and strength, which provided substantial evidence upon which the ALJ could discount Christopher's allegation that she did, as the ALJ stated, "basically nothing."

[12] For the reasons stated herein, *supra* and *infra,* the ALJ's determination that Kendrick's opinion was consistent with the medical record is supported by substantial evidence.

[13] Christopher points to the fact that Kendrick, a specialist in orthopedic surgery, testified that he would ordinarily refer RSD patients to neurologists and generally does not treat pain syndromes. (Doc. 6-2, at 61). Kendrick further testified that the neurologists, in the normal course, send patients with pain syndromes to pain specialists. The regulations provide that the SSA generally gives "more weight to the medical opinion of a specialist about medical issues related to his or her area of specialty than to the medical opinion of a source who is not

his opinion, but again, Kendrick provided bases for his medical opinion apart from merely noting the absence of significant showings during Christopher's examinations. Kendrick referenced EMG studies establishing issues with Christopher's left side, noting that Christopher had no EMG changes on the right side from previous studies indicating she had "anything wrong with her musculoskeletal or neurological system on her right side." (Doc. 6-2, at 59-60).   Kendrick also discounted the value of sensory examinations because they are subjectively driven and unreliable due to variables such as how hard a physician sticks the needle into one side of a patient compared with the other side.  (Doc. 6-2, at 58, 65-66). While Christopher often exhibited absent or mildly decreased deep tendon reflexes,[14] Kendrick

---

a specialist." 20 C.F.R. § 416.927(c)(5). In this case, however, Kendrick is a specialist, and Christopher's impairments were not all related to RSD. Further, Kendrick opined, *inter alia*, that if Christopher were not using her arms to the degree she alleged, Christopher would show atrophy and bone-related objective indicia. His expertise therefore bore on the relevant issue concerning RSD and limitations caused thereby. Moreover, the ALJ thoroughly articulated the ways in which she considered Dr. Lilik's records and the other medical evidence in the record. She did not, in other words, outright reject any findings recorded by Lilik, and even assuming, *arguendo*, that she did afford less weight to Lilik's opinions or notes, she was entitled to do so in light of other evidence. *See, e.g.*, *Colussy v. Colvin*, No. 13-CV-1269, 2014 WL 1766928, at *11 (W.D. Pa. May 2, 2014) ("[T]he ALJ improperly accorded little weight to the opinions of . . . Plaintiff's treating neurologist. The ALJ is entitled to weigh all of the evidence in the record and may assign a non-treating physician's opinion greater weight if that decision is supported by the record evidence.").

[14] Despite the reported progression of pain and limitation in her left side throughout the period of alleged disability, Christopher's deep tendon reflexes (DTR) would sometimes be normal or mildly decreased on her left side and absent in her right side, and sometimes be normal or mildly decreased on her right side and absent on her left. This remained true for several years even into 2018. (*See* Doc. 6-8, at 3 (Feb. 2013 exam notes indicating normal DTR at the biceps/triceps bilaterally); Doc. 6-8, at 51 (Aug. 2013 exam notes indicating normal DTR at the biceps/triceps); Doc. 6-8, at 48 (Oct. 2013 exam notes indicating normal DTR at the right biceps/triceps and mildly decreased DTR at the left biceps/triceps); Doc. 6-8, at 45 (Nov. 2013 exam notes indicating absent DTR at the biceps/triceps bilaterally); Doc. 6-8, at 39 (Feb. 2014 exam notes indicating absent DTR at the biceps/triceps bilaterally and normal DTR at the quadriceps and Achilles tendons); Doc. 6-22, at 36-37 (May 2014 exam

opined that a "reflex exam [does not] tell[] you much of anything." (Doc. 6-2, at 66).

Regarding Christopher's claw deformity, Kendrick further opined that such a deformity is

inconsistent with a corresponding ulnar nerve paralysis. (Doc. 6-2, at 67). As mentioned,

*supra*, Kendrick simply found inconsistencies between Christopher's self-reported complaints

and the objective or other evidence of any changes in the right side that would support the

extent of disability alleged by Christopher.

Kendrick's conclusions are not without other record support. It is notable that while

Kendrick "testified that he would not find the right upper extremity limitations until February

of 2018" the ALJ, "in deference to the claimant, [] provided them back to January 2016."

(Doc. 6-2, at 24). Further, Lilik's own notes reflect that Christopher's symptoms did not

always support the degree to which she alleges she is disabled. In November 2013, when

Christopher said she had begun feeling pain on her right side and reduced right-arm

functionality, Lilik noted that Christopher's dorsal left forearm had a pink color that was not

present on the right, and she had warmth in the dorsum of her left-hand fingers that was not

---

notes indicating absent DTR at the biceps/triceps bilaterally); Doc. 6-22, at 35 (Nov. 2014
exam notes indicating mildly decreased DTR at the right biceps, absent DTR at the left, and
mildly decreased DTR at the triceps bilaterally); Doc. 6-22, at 32 (May 2015 exam notes
indicating absent DTR at the right biceps/triceps, normal DTR at the left biceps/triceps,
absent DTR at the right quadriceps and normal on the left, and absent DTR at the Achilles
tendons); Doc. 6-22, at 30 (Jan. 2016 exam notes indicating "essentially" absent DTR at the
biceps/triceps); Doc. 6-22, at 29 (May 2016 exam notes indicating absent DTR at the biceps
bilaterally and at the right triceps and normal DTR at the left); Doc. 6-22, at 27 (Aug. 2016
exam notes indicating absent DTR at the right biceps/triceps and normal DTR at the left
biceps and triceps); Doc. 6-22, at 23 (Nov. 2017 exam notes indicating absent DTR at the
right biceps/triceps, normal DTR at the left biceps/triceps, mildly increased DTR at the right
quadriceps, and absent DTR at the left and the Achilles tendons bilaterally); Doc. 6-22, at 21
(Feb. 2018 exam notes indicating absent DTR at the right biceps/triceps, normal DTR at the
left biceps/triceps, and absent DTR at the quadriceps and Achilles tendons)).

present on the right. (Doc. 6-8, at 45). Similarly, upon meeting with pain management in late 2013, Christopher exhibited increased temperature on the left hand as compared to the right side, her left forearm looked more purple as compared to the right side. (Doc. 6-8, at 33). In November 2014, Lilik noted that Christopher's left hand remained cool, while making no mention of the right hand – at the same time, Christopher reported that the pain her right upper extremity had stabilized and lessened, and she could raise her right arm above shoulder height but not fully. (Doc. 6-22, at 34-35). In May 2015, Lilik noted Christopher complained of "some pain in her right shoulder," although he did not indicate the presence of any right shoulder or right-side pain. Later, in August 2016, Christopher felt pain in her right shoulder and forearm, but she had normal movement of her hand. It was not until November 2017 that Lilik reported Christopher's right hand had become cold intermittently and was often pale.[15]

There is also the examination by orthopedist John Rich, which, although conducted earlier on in September 2013, revealed that while Christopher was hypersensitive to touch, her left wrist had fairly good motion and there was no change in temperature between her hands or coloration of the skin. (Doc. 6-8, at 27). In November 2013, Rich noted that Christopher was able to use her thumb and index finger "fairly well" without difficulty and that he did not "think that it is bad enough for surgical release," pain management being the proper course of treatment. (Doc. 6-8, at 35). The ALJ gave Rich's opinions only limited partial weight to the extent they were longitudinally consistent with the fact that Christopher initially stopped working do to her heart condition, not RSD. (Doc. 6-2, at 30). In line with

---

[15] Though there do appear to be some objective signs of RSD that Kendrick did not adequately address, these signs manifested after January 2016, and the ALJ provided for limitations on Christopher's right upper extremity beginning at that time.

this opinion of Christopher's condition, several months later, in 2014, state agency physician Elizabeth Kamenar, M.D., opined that Christopher retained the ability to perform light work with lifting, carrying, standing/walking, sitting, pulling, and postural physical limitations, along with environmental ones. (Doc. 6-4, at 7-12). The ALJ gave Dr. Kamenar's opinion great weight, but also further reduced the limitations Kamenar placed on Christopher in light of Dr. Kendrick's testimony. (Doc. 6-2, at 30).

Regarding Christopher's argument that Kendrick did not place any limitation on her ability walk, the ALJ, who was solely responsible for crafting Christopher's RFC, took into consideration Christopher's issues involving her lower extremity, including her left ankle. Notably, on examination, Christopher's gait was generally reported as normal. (Doc. 6-8, at 37, 39, 45; Doc. 6-22, at 27). Aside from a May 2015 visit with Lilik where Christopher appeared to be limping on her left leg, the issues with her limping were reported after January 2016, *after* the ALJ assessed a new RFC to reflect a sedentary work capacity. Further, as the ALJ noted, in August 2016 and January 2017, Lilik reported that Christopher walked with a normal gait, and in February 2018, she was reported to be walking without difficulty. (Doc. 6-22, at 21, 25, 27).

Christopher also takes issue with the ALJ's other reasons for discounting Christopher's statements concerning the severity of her limitations. (Doc. 9, at 13). Christopher challenges the ALJ's reliance on the fact that Christopher stopped working because of her heart condition, and not because of the RSD or RSD-related injury. (Doc. 9, at 13). She also argues that the ALJ should not have given great weight to the opinion of the state agency physician, Dr. Kamenar, because Kamenar was not privy to medical records showing Christopher's progression concerning her RSD after 2014. (Doc. 9, at 13). Considered on its own,

Kamenar's opinion certainly does not provide grounds for discounting Christopher's subjective complaints and other medical records – but the ALJ relied on more than Kamenar's opinion, and the Court is required to review the entire record to determine whether the ALJ's RFC determination is supported by substantial evidence.

While Christopher urges the Court to adopt a reading of SSR 03-2p that would require the ALJ to accept her alleged limitations based on evidence of her progressing RSD in the record, the ruling itself indicates that "[t]he signs and symptoms of RSDS/CRPS may remain stable over time, improve, or worsen." SSR 03-2p, 2003 WL 22399117, at *4. Thus, "[d]ocumentation should, whenever appropriate, include a longitudinal clinical record containing detailed medical observations, treatment, the individual's response to treatment, complications of treatment, and a *detailed description of how the impairment limits the individual's ability to function and perform or sustain work activity over time*." SSR 03-2p, 2003 WL 22399117, at *4 (emphasis added). Here, it is true that Dr. Lilik's examination reports reflect Christopher's reports and indications increased pain and diminished range of motion concerning Christopher's right upper extremity and intermittent limping on her left side. However, nowhere in Lilik's notes does he expressly opine that Christopher had more functional limitations than the ALJ included in Christopher's two RFCs.

For example, considering the pre-January 2016 period of alleged disability, in November 2013, Lilik noted that Christopher reported pain in her right shoulder and upper arm and showed an inability to elevate her right arm to the side more than 50 degrees; in February 2014, Lilik noted that Christopher's pain had "extended to the left shoulder" and showed indications of hypersensitivity to touch on the right side, but there is no indication of restricted movement anywhere in Lilik's report; in May 2014, Lilik noted that Christopher

showed an inability to raise her right shoulder, some stiffening in her right hand, and pain in her right dorsum; in November 2014, Lilik noted that Christopher reported that her upper-right-extremity pain had stabilized, and she was able to raise her right arm over shoulder height, although not fully; and in May 2015, Lilik noted that Christopher reported some pain in her right shoulder. (Doc. 6-8, at 38-39, 44; Doc. 6-22, at 32, 34, 36-37). There is no doubt that RSD, according to the SSR, regulations, and medical record here, is a transient disorder that warrants a close examination of a claimant's subjective complaints. Nevertheless, Lilik's notes do not contradict the ALJ's determinations that, e.g., Christopher could lift and carry 20 pounds occasionally and 10 pounds frequently with her dominant right hand, nor do Lilik's notes necessitate reversal of the ALJ's determination in light of other record evidence. These disparate findings support issues with Christopher's right side, but there is no such quantum of proof here that would have required the ALJ to conclude that Christopher was more limited than the RFCs reflected.

Finally, Christopher cites to *Shannon v. Astrue*, No. 4:11-CV-00289, 2012 WL 1205816 (M.D. Pa. Apr. 11, 2012), but that case is inapposite. The ALJ in that case had "found that Shannon did not suffer from RSDS [reflex sympathetic dystrophy syndrome],"[16] neither as "a medically determinable impairment nor a severe impairment." *Shannon*, 2012 WL 1205816, at *9. Further, "the opinions of the state agency consultants . . . fail[ed] to address Shannon's RSDS or [we]re conclusory without reference to any medical evidence or a reasoned analysis of the medical evidence." *Shannon*, 2012 WL 1205816, at *12. Because the ALJ had erred in

---

[16] "RSDS is also known as Complex Regional Pain Syndrome." *Shannon*, 2012 WL 1205816, at *1.

inadequately addressing the claimant's RSDS at step-two of the sequential analysis, the ALJ had correspondingly failed to adequately consider the claimant's credibility concerning her statements about the intensity, persistence, and limiting effects of her symptoms. *Shannon, 2012 WL 1205816, at *13*. Judge Rambo therefore vacated the ALJ's determination and remanded the case for further consideration. *Shannon*, 2012 WL 1205816, at *14. Here, in contrast, the ALJ found Christopher's complex RSD to be a severe medically determinable impairment and thoroughly explained the reasons for which she determined that Christopher's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the medical evidence and other evidence in the record. Therefore, *Shannon* does not compel a different result under these circumstances.

## V.   CONCLUSION

Based on the foregoing, the Court will **AFFIRM** the Commissioner's decision, direct that **FINAL JUDGMENT BE ENTERED** in favor of the Commissioner and against Christopher, and direct the Clerk of Court to **CLOSE** this case.

An appropriate order will follow.

BY THE COURT:

Dated: August 1, 2020

*s/Karoline Mehalchick*

**KAROLINE MEHALCHICK**
**United States Magistrate Judge**